**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **APEX SYSTEMS, LLC,** | ) |
| **a Virginia Limited Liability Company,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.** ___3:21cv165___ |
| | ) |
| **BEACON HILL STAFFING GROUP, LLC,** | ) |
| **a Massachusetts Limited Liability Company,** | ) |
| **MADISON N. MERRIAM, an Individual, and** | ) |
| **SAMANTHA SCOTT, an Individual** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

## VERIFIED COMPLAINT

Plaintiff Apex Systems, LLC ("Apex" or "Plaintiff") files the following Verified Complaint against Defendants Beacon Hill Staffing Group, LLC ("Beacon Hill"), Samantha Scott ("Scott"), and Madison N. Merriam ("Merriam" and, collectively with Beacon Hill and Scott, "Defendants") for breach of contract and tortious interference with contractual relations.

1.      This is an action to stop Beacon Hill from poaching Apex's key employees and interfering with their clear and enforceable contractual obligations to Apex. Beacon Hill has built its business by hiring its competitors' employees and instructing them to ignore their restrictive covenant obligations. In recent years, Beacon Hill has targeted Apex with its "poach first, ask forgiveness later" recruitment and hiring strategy. Despite repeated warnings from Apex, Beacon Hill has persisted in its unlawful conduct by hiring Scott and Merriam to perform services in violation of their enforceable non-competition and other restrictive covenant obligations. With full knowledge of these obligations, Beacon Hill hired Scott and Merriam to compete with Apex in the same markets where they worked for Apex. Beacon Hill thus has left Apex with no choice

1

but to seek redress from this Court to (1) enjoin Scott and Merriam from violating their agreements with Apex; (2) enjoin Beacon Hill from tortiously interfering with Apex's agreements with its employees; and (3) award damages for the injuries Defendants have caused.

## THE PARTIES

2.      Apex is a Virginia limited liability company with its principal place of business in Glen Allen, Virginia.

3.      ASGN Inc. is Apex's sole member.  ASGN Inc. is incorporated in the State of Delaware and has its principal place of business in Glen Allen, Virginia.

4.      Beacon Hill is a Massachusetts limited liability company authorized to conduct business in the Commonwealth of Virginia. It may be served with process through its registered agent, Corporation Service Company, located at 100 Shockoe Slip, Floor 2, Richmond, VA 23219. Beacon Hill has four members, and no member is a resident of either the Commonwealth of Virginia or the State of Delaware: Steven Drooker ("Drooker"), its managing member; Shelley Cohen ("Cohen") as Trustee of the GBD Separate Trust established under the Drooker Family 2019 Trust; Cohen as Trustee of the MJD Separate Trust established under the Drooker Family 2019 Trust; and Cohen as Trustee of the CAD Separate Trust established under the Drooker Family 2019 Trust. Drooker resides and is permanently domiciled in Massachusetts. Cohen resides and is permanently domiciled in Florida. Each of the trusts has one beneficiary. Each beneficiary resides and is permanently domiciled in Massachusetts. One beneficiary is a minor and both parents of the minor reside and are permanently domiciled in Massachusetts. Each of the trusts is an irrevocable trust and the situs of each is in Florida.

5.      Upon information and belief, Merriam is a resident of Washington, D.C. and is subject to service of process at her residence located at 1212 4th Street SE, Apt. 924, Washington, D.C. 20003.

6.      Upon information and belief, Scott is a resident of Tampa, Florida and is subject to services of process at her residence located at 10239 Oasis Palm Drive, Tampa, FL 33615.

### JURISDICTION AND VENUE

7.      On November 2, 2015, Scott executed a Confidentiality, Noncompetition, Nonsolicitation, and Nondisclosure Agreement (the "Scott Agreement").  A copy of the Scott Agreement is attached as **Exhibit 1**.

8.      This Court has personal jurisdiction over Scott because the Scott Agreement provides that "all actions under this Agreement shall be brought exclusively and only in Virginia, and if in state court, in the county of Henrico, and if in federal court, in the United States District Court for the Eastern District of Virginia, Richmond Division.  ***Employee consents to personal jurisdiction in Virginia for the purposes of any such court action.***"  **Exhibit 1**, at § 11 (emphasis added).

9.      On October 17, 2018, Merriam executed a Confidentiality, Noncompetition, Nonsolicitation, and Nondisclosure Agreement (the "Merriam Agreement").  A copy of the Merriam Agreement is attached as **Exhibit 2**.

10.      This Court has personal jurisdiction over Merriam because the Merriam Agreement provides that "all actions under this Agreement shall be brought exclusively and only in Virginia, and if in state court, in the county of Henrico, and if in federal court, in the United States District Court for the Eastern District of Virginia, Richmond Division.  ***Employee consents to personal***

*jurisdiction in Virginia for the purposes of any such court action.*"  **Exhibit 2**, at § 11 (emphasis added).

11.     This Court has personal jurisdiction over Beacon Hill under Fed. R. Civ. P. 4(k) and Va. Code § 8.01-328.1 because Beacon Hill maintains at least two offices and regularly transacts business in the Commonwealth of Virginia.

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of the parties and the amount in controversy exceeds $75,000.00.

13.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(3) because Beacon Hill, Scott, and Merriam are subject to this Court's personal jurisdiction with respect to this lawsuit.

## FACTUAL BACKGROUND

### Apex and Beacon Hill Are Competitors in the Staffing Industry

14.     Apex is a staffing company, which has provided technical and professional recruiting, staffing, consulting, and business services to companies throughout the United States since 1995.  Apex specializes in providing its customers with personnel for temporary and temporary-to-permanent duty assignments in a wide variety of industries, including in information systems, information technology, finance, accounting, and applications.  Apex has grown into a successful and competitive leader in the staffing industry with more than seventy (70) branch offices in more than thirty (30) states.

15.     The professional staffing industry is highly competitive.  Success in the industry depends on, among other things, identifying and developing relationships with customers.  By fostering customer relationships, staffing companies learn specific customer needs and

preferences.  The combination of customer relationships and an ability to locate, evaluate, and present successful staffing candidates provides a competitive advantage in the industry.

16.     Apex owes its success to its focus on investing in employees who provide high quality service to, and establish lasting relationships with, its customers.  In addition, Apex's employees focus continuously on ways to help customers grow their businesses and improve their profits.  As a result, Apex has developed many valuable customer relationships.

17.     Beacon Hill is one of Apex's main competitors in the staffing industry.  Like Apex, Beacon Hill is a staffing company which recruits talent to be placed in a variety of temporary and permanent positions at customers' businesses, which range in size and industry served.

18.     Beacon Hill provides these services through its more than 950 search and staffing professionals and 5,300 consultants operating out of more than 56 locations in the United States.

19.     Beacon Hill performs the same services as Apex, competes for many of the same customers and clients as Apex, and competes in many of the same geographic markets as Apex.

**Beacon Hill's "Poach First, Ask Forgiveness Later" Hiring Practices**

20.     Since 2009, Beacon Hill has experienced significant growth by regularly hiring employees from its competitors despite the existence of valid restrictive covenant agreements that limit or preclude such employment with Beacon Hill.

21.     Beacon Hill has hired employees subject to restrictive covenants from other staffing companies, including Randstad, Kforce, Aerotek, and Collabera.

22.     Beacon Hill has hired these employees knowing that they are bound by valid and enforceable restrictive covenant agreements, in some cases because the employee has affirmatively notified Beacon Hill of the agreement and provided it with a copy.

23.     Despite knowing of these agreements, Beacon Hill has moved forward with the hiring process.

24.     On information and belief, Beacon Hill has instructed its new hires to disregard their agreements and that it will pay the cost to defend them against any claims related to their restrictive covenants.

25.     Despite its general knowledge that competitors in the staffing industry use restrictive covenants, Beacon Hill does not—as a matter of established business policy—ask whether an employee is bound by such covenants.

26.     These practices have resulted in Beacon Hill being named as a defendant in more than 20 trade secrets and restrictive covenant lawsuits in 14 different states since 2011.  For example:

   a.     On November 14, 2011, TEKsystems, Inc., filed suit against Beacon Hill alleging misappropriation of trade secrets and tortious interference with a restrictive covenant agreement. *TEKsystems, Inc. v. Sutton,* et al., No. 3:11-cv-00767-bbc (W.D. Wis.).

   b.     On July 9, 2012, Update, Inc. filed suit against Beacon Hill alleging misappropriation of trade secrets and tortious interference with restrictive covenant agreements. *Update Inc. v. Mercado*, et al., No. 1:12-cv-05295-PAC (S.D.N.Y.).

   c.     On May 2, 2014, Internal Data Resources, Inc. filed a lawsuit against Beacon Hill alleging tortious interference with a restrictive covenant agreement. *Internal Data Resources, Inc. v. Beacon Hill Staffing Group, LLC*, et al., No. 1:14-cv-01860-RWS (N.D. Ga.).[1]

---

[1] The case was originally filed in Fulton County Superior Court and later removed.

d.      On January 21, 2014, TEKsystems, Inc. filed a lawsuit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *TEKsystems, Inc. v. Deal*, et al., No. 0:14-cv-00196-JRT-JJK (D. Minn.).

e.      On September 15, 2014, Randstad filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Randstad General Partner (US) LLC v. Smith*, No. 1:14-cv-07167 (N.D. Ill.).

f.      On October 10, 2014, Convergenz, LLC filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Convergenz, LLC v. Beacon Hill Staffing Group, LLC*, No. 1:14-cv-01864-ABJ (D.D.C.).[2]

g.      On November 6, 2014, Kforce, Inc. filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Kforce, Inc. v. Beacon Hill Staffing Group, LLC*, et al., No. 4:14-cv-01880-CDP (E.D. Mo.).

h.      On April 17, 2015, Diversant, LLC filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Diversant, LLC v. Beacon Hill Staffing Group, LLC*, No. 3:15-cv-00172-RJC-DSC (W.D.N.C.).

i.      On June 23, 2015, Modis, Inc. filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Modis, Inc. v. Beacon Hill Staffing Group, LLC,* et al., No. 4:15-cv-00110-SMR-RAW (S.D. Iowa).[3]

j.      On January 20, 2017, Insight Global, LLC filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade

---

[2] The case was originally filed in the Superior Court of the District of Columbia and later removed.
[3] Modis, Inc. originally filed suit on April 13, 2015 only against its ex-employee, Adam Viet. It subsequently filed an amended complaint to include Beacon Hill as a defendant.

secrets. *Insight Global, LLC v. Beacon Hill Staffing Group, LLC*, et al., No. 5:17-cv-00309-BLF (N.D. Cal.). The court entered a preliminary injunction prohibiting Insight Global, LLC's former employee from working for Beacon Hill in violation of his restrictive covenant agreement.

k.     On March 10, 2017, Randstad filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Randstad General Partner (US) LLC v. Beacon Hill Staffing Group, LLC*, et al. No. 1:17-cv-00680-ELH (D. Md.).

l.     On March 10, 2017, Randstad filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Randstad General Partner (US) LLC v. Keliher*, et al., No. 1:17-cv-10404-ADB (D. Mass.).

m.     On August 8, 2017, Insight Global, LLC filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. In this action, Insight Global, LLC alleged that in the month preceding the complaint, Beacon Hill hired no less than five Insight Global employees and was taking active steps to conceal these hires from Insight Global. *Insight Global, LLC v. McDonald*, et al., No. 1:17-cv-01915-MSK-MJW (D. Colo.).

n.     On August 8, 2017, Insight Global, LLC filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Insight Global, LLC v. Lilley*, et al., No. 4:17-cv-02440 (S.D. Tex.).

o.     On September 25, 2017, Aerotek, Inc. filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Aerotek, Inc. v. Murphy*, et al., No. 4:17-cv-02469-HEA (E.D. Mo.).

p.      On April 27, 2018, Robert Half International, Inc. filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Robert Half International, Inc.*, *v. Beacon Hill Staffing Group, LLC,* et al., No. 1:18-cv-01001-APM (D.D.C.).   The court entered a preliminary injunction against Beacon Hill prohibiting Beacon Hill from interfering with the former Robert Half International, Inc. employee's restrictive covenant agreement.

q.      On October 27, 2017, Insight Global, LLC filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and misappropriation of trade secrets. *Insight Global, LLC v. Wenzel*, et al., No. 1:17-cv-08323-PGG (S.D.N.Y.).

r.      On March 9, 2019, Randstad General Partner (US), LLC filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement and civil conspiracy. It was later removed to this Court from Superior Court of Cobb County, Georgia. *Randstad General Partner (US), LLC v. Beacon Hill Staffing Group, LLC,* et al., No. 1:19-cv-01655-MHC (N.D. Ga.).

s.      On September 4, 2020, Randstad General Partner (US), LLC filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement, unfair competition, and civil conspiracy. It was later removed to the United States District Court for the Northern District of Texas from the District Court of Dallas County, Texas. *Randstad General Partner (US), LLC and Randstad Technologies, LLC v. Beacon Hill Staffing Group, LLC,* et al., No. 3:20-cv-02814-N (N.D. Tex.).

t.      On February 21, 2021, Collabera, Inc. filed suit against Beacon Hill alleging tortious interference with a restrictive covenant agreement.  *Collabera, Inc. v. Beacon Hill Staffing Group, LLC*, et al., No. 1:21-cv-00645-MHC (N.D. Ga.).

27.    Beacon Hill's extensive litigation history reflects its willful disregard of the contractual rights owed to its competitors by their employees.

28.    Upon information and belief, Beacon Hill's corporate leadership, including its Chief Executive Officer Andrew Wang, has determined that defending legal claims for aiding and abetting individuals in the breach of their agreements is an acceptable cost of doing business to Beacon Hill.

29.    Beacon Hill seeks to reap the benefits of its poaching strategy by negotiating with competitors like Apex to discourage them from bringing litigation to enforce the applicable agreements.  Beacon Hill's actions, however, amount to a bad faith attempt to extract confidential information, customer goodwill, and expertise from its competitors' former employees before such negotiations fail and the competitor is forced to bring an enforcement action in court.

30.    Beacon Hill also actively encourages its new employees to conceal their new employment from their former employers.

31.    For example, on information and belief, Beacon Hill instructs newly hired employees either to not identify Beacon Hill as their employer on their LinkedIn profiles and other social media—instead using a generic descriptor—or to forego updating their job information on social media altogether.

**Beacon Hill Targets Apex with Its Hiring Strategy**

32.    Apex has not been immune to Beacon Hill's "Poach First, Ask Forgiveness Later" recruiting and hiring strategy.

33.    Between September 2017 and November 2020, Beacon Hill hired approximately sixteen Apex employees for competitive positions, most, if not all, of whom were subject to valid restrictive covenant agreements.

34.     Despite warnings related to these incidents, Beacon Hill's targeting of Apex employees has continued unabated.  For example, in September 2020, Beacon Hill undertook a multi-employee recruiting effort of Apex employees in Phoenix, Arizona.  Beacon Hill sought to hire these employees to open a new Beacon Hill office in the same geographic location.

35.     Given Beacon Hill's continued efforts to undermine Apex's restrictive covenant agreements with its employees, on September 28, 2020, Apex's counsel sent Beacon Hill's Chief Executive Officer, Andy Wang, a letter demanding that Beacon Hill cease and desist interfering with Apex's restrictive covenant agreements with its employees.  A copy of the letter is attached as **Exhibit 3**.  The letter specifically noted: "As described above, the Apex employees being targeted by Beacon Hill have signed agreements that restrict their ability to work for Beacon Hill for a period of time.  Should Beacon Hill continue to recruit and (if successful) hire Apex employees subject to these covenants, Apex will consider these actions to be a willful interference with the contractual relationships between [Apex] and its employees.  Any future recruitment of Apex employees of this nature, in Phoenix or elsewhere, will be met with swift action." *Id.*

36.     Beacon Hill did not respond to this letter. It still has not provided adequate assurances that it will stop interfering with Apex's contractual relationships with its employees. To the contrary, since receiving the letter Beacon Hill has continued recruiting Apex employees and has hired more Apex employees, including Scott and Merriam, for positions that violate their restrictive covenant obligations to Apex.

### Apex's Restrictive Covenant Agreements

37.     In Apex's more than twenty years of existence, it has compiled and created valuable confidential information through the relationships it has developed and maintained and the services

it has provided.  Apex's employees draw on this growing body of historical knowledge to provide its customers with the exceptional service they have come to expect from Apex.

38.     Apex's confidential information includes, but is not limited to, customer contact lists, customer leads and prospects, customer history and analysis, marketing plans, data analytics, market strategies and analyses, information about key customer relationships and the terms thereof, including pricing, customer needs and preferences, recruiting assessments, Apex's business practices and plans, non-public financial records, research and development data, technical data, know-how, operational data, and information about the business affairs of third-parties (including, but not limited to, Apex's customers) that such third-parties provide to Apex in confidence.

39.     Apex has expended and continues to expend considerable resources developing this information and the relationships its employees cultivate with customers using this information. This information and these relationships were developed for the benefit of Apex, not the employees individually.   Additionally, Apex's employees benefit from the goodwill and customer relationships that Apex has developed and maintained throughout its existence.

40.     Because Apex's information and business relationships are so sensitive and valuable, Apex undertakes significant efforts to protect itself from unfair competition by former employees, including, but not limited to, requiring key employees to sign contracts containing restrictive covenants.

41.     Apex requires certain employees, including those in management and customer-facing roles, to sign a Confidentiality, Noncompetition, Nonsolicitation, and Nondisclosure Agreement as a condition of their employment or continued employment with Apex.  Scott and

Merriam each signed a Confidentiality, Noncompetition, Nonsolicitation, and Nondisclosure Agreement. *See* **Exhibit 1** and **Exhibit 2**.

42. The Scott Agreement and Merriam Agreement each contains a confidentiality provision; a customer non-solicitation provision; and a non-competition provision. **Exhibit 1 and Exhibit 2**, at §§ 2, 4.

43. Each agreement defines "Confidential Information" as "information about the Company . . . and its subsidiaries, employees, clients, and/or candidates for assignment which is not generally known outside of the Company, which Employee has learned or learns of in connection with Employee's employment with the Company, and which would be useful to competitors of the Company." *Id.*, at § 1(a).

44. Each agreement further provides: "To assist Employee in the performance of his or her duties for Apex, the Company or ASGN, Inc. or its subsidiaries and affiliates have provided and will provide to Employee certain Confidential Information and Trade Secrets. Employee agrees that he or she shall not directly or indirectly divulge or make use of any Confidential Information or Trade Secrets without prior written consent of the Company." *Id.*, at § 2.

45. Scott and Merriam's respective obligations to maintain the confidentiality of Apex's confidential information commenced "immediately upon the Employee first having access to such Confidential Information (whether before or after he begins employment by the Company)" and "continue[s] during his or her employment with the Company and for a period of three (3) years thereafter, or as otherwise protected by applicable law, including the Virginia Uniform Trade Secrets Act, whichever is longer." *Id.*

46. By signing their respective agreements, Scott and Merriam also each "acknowledge[d] that he or she has or will receive from the Company, ASGN, Inc., and/or its

subsidiaries and affiliates, valuable information, instruction and training, and that his or her services to be rendered are of a special character which have unique value to the Company, the loss of which will not be readily calculable." *Id.*, at § 4.

47.     "Given this unique value, the training the Company has provided and will continue to provide to Employee, the expenditure of money and /or effort to be incurred by the Company in connection with the employment of Employee, and in light of the confidential information and/or exposures to customers to be obtained by or disclosed to Employee, and as a material inducement to the Company to employ or continue to employ Employee," Scott and Merriam also agreed to certain non-solicitation and non-competition obligations. *Id.*

48.     The Scott Agreement and the Merriam Agreement each states:  "During the Restricted Period, and within the Restricted Territory, Employee agrees that he shall not, directly or indirectly, whether on Employee's own behalf or on behalf of any other person or entity, work in a Competing Position for a Competing Business. Employee further agrees that, during the Restricted Period, he shall not supervise, manage or control, or participate in the supervision, management or control, of a Competing Business, where Employee's primary duty is to engage in the Business of the Company within the Restricted Territory." *Id.*

49.     Under the agreements, "Restricted Period" means "during Employee's employment with the Company, and a period of eighteen (18) months following the cessation of Employee's employment with the Company for any reason, including resignation by Employee." *Id.*, at § 1(h).

50.     The agreements define "Restricted Territory" as "a fifty (50) mile radius around any Apex office, including Employee's home office (if applicable), in which the Employee regularly worked (i.e., more than 50% of the time in a given month) during the twenty-four (24) months immediately preceding the cessation of employment." *Id.*, at § 1(i).

51.     "Competing Position" means "a position held by the Employee with a Competing Business that involves duties within the Restricted Territory that are the same as or substantially similar to the duties the Employee performed for the Company within the last twelve (12) months of Employee's employment with the Company." *Id.,* at § 1(g).

52.     A "Competing Business" is "any person, business or subdivision of a business which provides products or services that are the same as or substantially similar to, and competitive with, the Business of the Company, or which is actively planning to engage in the Business of the Company; but excluding subdivisions of a business, if any, which do not primarily engage in the Business of the Company." *Id.*, at § 1(f).

53.     The "Business of the Company" means "the recruiting and/or staffing of technical, computer, telecommunications, information technology, information systems or applications personnel, or related financial personnel, for or on behalf of businesses, or providing such personnel to businesses on a temporary or permanent basis." *Id.*, at § 1(e).

54.     The Scott Agreement and the Merriam Agreement further prohibit each of them from "(i) divert[ing] from the Company any Customer of the Company with whom Employee had Material Contact, for the purpose of engaging in the Business of the Company for a Competing Business; or (ii) within the Restricted Territory, sell[ing] or offer[ing] to sell, whether on Employee's own behalf or on behalf of any other person or entity, products or services related to the Business of the Company for a Competing Business to any Customer of the Company with whom Employee had Material Contact." *Id.*, at § 4(b).

55.     The agreements define "Customer" as "(i) any person or business entity to which the Company has provided personnel staffing services within the twelve (12) month period immediately preceding the cessation of Employee's employment with the Company or (ii) any

person or business entity with whom Employee has communicated on behalf of the Company for the purpose of offering services provided by the Company during the twelve (12) months preceding the cessation of Employee's employment."  *Id.*, at § 1(c).

56.     "Material Contact" means "contact between Employee and any Customer within twelve (12) months prior to Employee's termination or resignation; provided, however, that: (i) Employee communicated directly with such Customer on behalf of the Company during the twelve (12) month period; or (ii) Employee obtained confidential information about such Customer in the ordinary course of business as a result of Employee's association with the Company."  *Id.*, at § 1(d).

57.     By signing their respective agreements, Scott and Merriam each acknowledged that she "has substantial work experience and knowledge such that Employee can readily obtain subsequent employment which does not violate this Agreement."  *Id.*, at § 6.

58.     Finally, their respective agreements required Scott and Merriam to promptly advise Apex if they obtained employment elsewhere during the Restricted Period.  This obligation provides: "Employee agrees that, during the Restricted Period, Employee will disclose to the Company any employment obtained by Employee after the cessation of Employee's employment with the Company. Such disclosure shall be made within two (2) weeks of Employee's obtaining such employment. Employee expressly consents to and authorizes Company to disclose to any subsequent employer of Employee both the existence and terms of this Agreement and to take any steps the Company deems necessary to enforce this Agreement."  *Id.*, at § 7.

## Scott's Employment with Apex and Beacon Hill

59.     Apex hired Scott as an Account Manager in its Tampa, Florida office in October 2015.

60.     Before her employment with Apex, Scott had little or no experience in the staffing industry.  Apex expended significant time and effort to train Scott and to ensure her success with the company.

61.     As a condition of her employment, and at the time of her hire, she executed the Scott Agreement containing the terms described above.  *See* **Exhibit 1**.

62.     As an Account Manager, Scott was responsible for business to business sales for new and existing clients in the fields of information technology, business applications, and telecommunications.  As part of her duties, she acted as a business partner to advise clients on the appropriate staffing models based on the clients' goals.  She worked closely with the recruiting team to identify, screen, and place technical resources with clients in the Florida market.  She also maintained vendor relations by providing ongoing communications and resolved problems for internal and external employee conflicts and deficiencies.

63.     Scott was successful in her role as an Account Manager, winning Accounting Manager MVP of the Year – Florida District and President's Club Top Performer awards.

64.     Throughout her employment with Apex, Apex provided Scott with access to Apex's confidential information and trade secrets.  Scott relied on Apex's confidential information and trade secrets to carry out her job duties for Apex.

65.     While employed by Apex, Scott did not notify Apex that Beacon Hill, or someone representing Beacon Hill, had contacted her to recruit her for employment.

66.     While employed by Apex, and before giving notice of her resignation, Scott accepted an offer of employment from Beacon Hill.

67.     Scott called her manager on the morning of November 30, 2020 and informed her manager that she was resigning from Apex effective immediately.  She did not provide any details

on the reason for her resignation but stated only that it was a personal decision.   Scott also did not complete Apex's exit survey.

68.     When she resigned, Scott failed to inform Apex of her future plans or state that she had accepted employment with Beacon Hill, despite her contractual obligation to do so.  Scott still has not informed Apex of her job duties and activities for Beacon Hill.

69.     Upon information and belief, Beacon Hill instructed Scott not to give any advance notice of her resignation, not to explain the reason for her resignation, and not to provide Apex any information on her future plans.

70.     Upon information and belief, during Beacon Hill's recruiting process, but before Scott accepted an offer of employment with Beacon Hill, she advised Beacon Hill of the existence of the Scott Agreement attached as Exhibit 1.

71.     Upon information and belief, before accepting an offer of employment with Beacon Hill, Scott provided Beacon Hill with a copy of the Scott Agreement attached as Exhibit 1.

72.     Beacon Hill knew or reasonably should have known when it hired Scott that she was subject to specific confidentiality, non-solicitation, and non-competition obligations to Apex because Apex previously notified Beacon Hill that Apex employees are subject to restrictive covenant agreements and demanded that Beacon Hill cease tortiously interfering with those agreements.

73.     Upon information and belief, consistent with its recruiting practices, Beacon Hill advised Scott not to worry about her restrictive covenant obligations to Apex and that Beacon Hill would pay for Scott's costs of defense if Apex tried to enforce those obligations through litigation.

74.     Shortly after her last day of Apex employment, Scott began working for Beacon Hill as a Division Manager in Beacon Hill's Tampa, Florida office.

75.     Beacon Hill's Tampa, Florida office is within fifty (50) miles of the Apex office in which Scott worked and therefore is in the "Restricted Territory."

76.     As a Beacon Hill Division Manager, Scott's duties for Beacon Hill are the same as, or substantially similar to, the duties she performed for Apex.

77.     Scott is assisting Beacon Hill in the business of providing professional information technology recruiting, staffing, consulting, and business services.  Beacon Hill's website touts Scott's commitment "to build[ing] long lasting customer relationships based on quality and trust and work[ing] with clients by listening to their individual needs to deliver top talent."

78.     Additionally, Scott has sought information about one or more of her former Apex customers.

79.     Upon information and belief, Scott has contacted one or more of her former Apex customers and has solicited one or more of her former Apex customers to purchase services or products from Beacon Hill that are competitive with Apex's services or products.

80.     On January 4, 2021, Apex's counsel sent Beacon Hill's counsel a letter to reiterate "Apex's concerns" regarding Beacon Hill's "pattern of its recruiting and hiring Apex employees who were subject to restrictive covenants."  A copy of the letter is attached as **Exhibit 4**.  The letter referenced Beacon Hill's hiring of Scott and attached a copy of the Scott Agreement.  *Id.*

81.     Apex's counsel spoke with Beacon Hill's counsel on January 14, 2020 regarding Beacon Hill's recruitment and hiring of Apex's employees subject to restrictive covenant agreements.  During the conversation, Beacon Hill's counsel said that he checked with Beacon Hill's Human Resources Department and that Beacon Hill did not have an employee named Samantha Macchi, which is Scott's maiden name.  Beacon Hill's counsel, however, also promised that he would check again if Beacon Hill recently hired a former Apex employee in Florida.

Despite this promise, and another follow-up e-mail from Apex's counsel, Beacon Hill's counsel did not provide any further information regarding Scott and ceased communications on this issue entirely.

82.     Given Beacon Hill's continued failure to respond adequately to Apex's concerns, on February 2, 2021, Apex's counsel sent Scott a letter demanding that she comply with her restrictive covenant obligations to Apex.  A copy of the letter is attached as **Exhibit 5**.  The letter demanded that Scott respond within seven (7) days of receiving the letter.  Apex's counsel also sent a copy of the letter to Beacon Hill's counsel.

83.     To date, neither Scott nor Beacon Hill has responded to the letter.  Scott continues to work for Beacon Hill in a position that violates her restrictive covenant obligations to Apex.

### Merriam's Employment with Apex and Beacon Hill

84.     Apex hired Merriam as an Account Manager in its DC Metro office located in Falls Church, Virginia in March 2016.

85.     Before her employment with Apex, Merriam had limited or no experience in the staffing industry.  Apex expended significant time and effort to train Merriam and to ensure her success with the company.

86.     In October 2018, Apex promoted Merriam to the position of Sales Director – Government Services.  In connection with her promotion, and as a condition of her continued employment with Apex, Merriam executed the Merriam Agreement containing the terms described above.

87.     As a Sales Director, Merriam's responsibilities included developing key growth strategies, tactics, and action plans.  She was responsible for building and maintaining strong, long-lasting customer relationships, partnering with customers to understand and to meet their business

needs and objectives.  In addition to developing and managing Account Managers and supporting them in the development of new business, Merriam also was involved in business to business sales for new and existing commercial and government clients.   As part of her duties, she acted as a business partner to advise clients on the appropriate staffing models based on the clients' goals. As a Sales Director, Merriam was involved in servicing forty (40) to fifty (50) accounts for Apex.

88.     Merriam was successful in her role as first an Account Manager and then as a Sales Director, winning multiple awards, including DC Metro Rookie of the Year, 2017 President's Club Top Performer, and 2018 President's Club Top Performer.

89.     Throughout her employment with Apex, Apex provided Merriam with access to Apex's confidential information and trade secrets.   Merriam relied on Apex's confidential information and trade secrets to carry out her job duties for Apex.

90.     While employed by Apex, Merriam did not notify Apex that Beacon Hill, or someone representing Beacon Hill, had contacted her to recruit her for employment.

91.     While employed by Apex, and before giving notice of her resignation, Merriam accepted an offer of employment from Beacon Hill.

92.     Merriam resigned from employment with Apex by telephone on August 17, 2020. Merriam stated that it was a difficult time, that she would not answer any questions, and that her resignation was effective immediately.

93.     When she resigned, Merriam did not inform Apex of her future plans or state that she had accepted employment with Beacon Hill.  Merriam still has not informed Apex of her job duties and activities for Beacon Hill.  She did not provide any details on the reason for her resignation and also did not complete Apex's exit survey.

94.     Upon information and belief, Beacon Hill instructed Merriam not to give any advance notice of her resignation, not to explain the reason for her resignation, and not to provide Apex any information on her future plans.

95.     Upon information and belief, during Beacon Hill's recruiting process, but before Merriam accepted an offer of employment with Beacon Hill, she advised Beacon Hill of the existence the Merriam Agreement attached as Exhibit 2.

96.     Upon information and belief, prior to accepting an offer of employment with Beacon Hill, Merriam provided Beacon Hill with a copy of the Merriam Agreement attached as Exhibit 2.

97.     Beacon Hill either knew or should have known when it hired Merriam that she was subject to specific confidentiality, non-solicitation, and non-competition obligations to Apex because Apex previously notified Beacon Hill that Apex employees are subject to restrictive covenant agreements and demanded that Beacon Hill cease tortiously interfering with those agreements.

98.     Upon information and belief, consistent with its recruiting practices, Beacon Hill advised Merriam not to worry about her restrictive covenant obligations to Apex and that Beacon Hill would pay for Merriam's costs of defense if Apex tried to enforce those obligations through litigation.

99.     Shortly after her last day of Apex employment, Merriam began working for Beacon Hill as a Division Manager in Beacon Hill's Washington D.C. office.

100.    Beacon Hill's Washington D.C. office is within fifty (50) miles of the Apex office in which Merriam worked for Apex and therefore is in the "Restricted Territory."

101.     As a Beacon Hill Division Manager, Merriam's duties for Beacon Hill are the same as, or substantially similar to, the duties she performed for Apex.

102.     Merriam is assisting Beacon Hill in the business of providing professional information technology recruiting, staffing, consulting, and business services, including for commercial and government contractor clients.

103.     Merriam tried to prevent Apex from learning that she had started working for Beacon Hill in a competing position.  For example, she did not initially update her LinkedIn profile to reflect her employment with Beacon Hill.

104.     On December 9, 2020, shortly after Apex learned that Merriam was working for Beacon Hill, Apex's counsel contacted Beacon Hill's counsel to discuss the situation and Apex's concerns.

105.     As described above, on January 4, 2021, Apex's counsel sent Beacon Hill's counsel a letter reiterating "Apex's concerns" about Beacon Hill's "pattern of its recruiting and hiring Apex employees who were subject to restrictive covenants."  *See* **Exhibit 4**.  The letter specifically referenced Beacon Hill's hiring of Merriam and attached a copy of the Merriam Agreement.  *Id.*

106.     Apex's counsel spoke with Beacon Hill's counsel on January 14, 2020 regarding Beacon Hill's recruitment and hiring of Apex's employees subject to restrictive covenant agreements.  During the conversation, Beacon Hill's counsel failed to provide adequate assurances that Merriam's employment with Beacon Hill did not violate her restrictive covenant obligations to Apex.

107.     On January 27, 2020, Apex's counsel sent Beacon Hill's counsel a follow-up e-mail regarding Merriam.  A copy of the e-mail is attached as **Exhibit 6**.  The e-mail requested that Beacon Hill provide specific information about which accounts she was servicing for Beacon Hill

and noted that "Apex would agree the names of the [Beacon Hill] accounts will only be shared with its in-house counsel, the Executive Vice President to whom [Merriam] reported, and Apex's Chief Operating Officer (if needed)."  Beacon Hill did not respond to this e-mail and ceased communications on this issue entirely.

108.   Given Beacon Hill's continued failure to respond adequately to Apex's concerns, on February 2, 2021, Apex's counsel sent Merriam a letter demanding that she comply with her restrictive covenant obligations to Apex.  A copy of the letter is attached as **Exhibit 7**.  The letter demanded that Merriam respond within seven (7) days of receiving the letter.  Apex also sent a copy of the letter to Beacon Hill's counsel.

109.   To date, neither Merriam nor Beacon Hill has responded to the letter.  Merriam continues to work for Beacon Hill in a position that violates her restrictive covenant obligations to Apex.

## COUNT I

### Breach of Contract against Scott

110.   Apex incorporates by reference Paragraphs 1-109 of this Verified Complaint.

111.   The Scott Agreement attached as **Exhibit 1** is a valid, binding, and legally enforceable contract between Apex and Scott.

112.   Apex and Scott exchanged adequate and sufficient consideration in connection with the Scott Agreement.

113.   The restrictions on disclosure of confidential information, non-solicitation, and non-competition in the Scott Agreement and described above are valid, reasonable, and enforceable.

114.    The restraints imposed by such restrictions are no greater than necessary to protect Apex's legitimate business interests.

115.    The restrictions contained in the Scott Agreement are not unreasonably harsh or oppressive in curtailing Scott's legitimate efforts to earn a livelihood.

116.    The restraints imposed by such restrictions are reasonable from the standpoint of public policy and are consistent with industry standards.

117.    The temporal limitations set forth in the confidentiality, non-solicitation, and non-competition provisions in the Scott Agreement are reasonable in light of Apex's legitimate business interests and the competitive nature of the staffing industry.

118.    Beacon Hill is a "Competing Business" as that term is defined in the Scott Agreement.

119.    Scott breached the Scott Agreement by, among other things, working for Beacon Hill in a "Competing Position" during the "Restricted Period" in the "Restricted Territory" and failing to advise Apex of her employment with Beacon Hill.

120.    Scott continues to breach the Scott Agreement by working for Beacon Hill in a "Competing Position" during the "Restricted Period" in the "Restricted Territory."

121.    Apex has performed all of its obligations under the Scott Agreement.

122.    As a consequence of Scott's conduct, Apex has suffered and/or will continue to suffer irreparable harm or loss, and has suffered and will continue to suffer financial and economic loss.

123.    Scott's breach of the Scott Agreement has proximately caused financial harm to Apex in an amount to be proven at trial.  Such amount, however, is no less than $75,000, which

represents the value of an injunction protecting Apex against unfair competition from Scott and Apex's lost profits.

## COUNT II

### Breach of Contract against Merriam

124.    Apex incorporates by reference Paragraphs 1-123 of this Verified Complaint.

125.    The Merriam Agreement attached as **Exhibit 2** is a valid, binding, and legally enforceable contract between Apex and Merriam.

126.    Apex and Merriam exchanged adequate and sufficient consideration in connection with the Merriam Agreement.

127.    The restrictions on disclosure of confidential information, non-solicitation, and non-competition in the Merriam Agreement and described above are valid, reasonable, and enforceable.

128.    The restraints imposed by such restrictions are no greater than necessary to protect Apex's legitimate business interests.

129.    The restrictions contained in the Merriam Agreement are not unreasonably harsh or oppressive in curtailing Merriam's legitimate efforts to earn a livelihood.

130.    The restraints imposed by such restrictions are reasonable from the standpoint of public policy and are consistent with industry standards.

131.    The temporal limitations set forth in the confidentiality, non-solicitation, and non-competition provisions in the Merriam Agreement are reasonable in light of Apex's legitimate business interests and the competitive nature of the staffing industry.

132.    Beacon Hill is a "Competing Business" as that term is defined in the Merriam Agreement.

133.    Merriam breached the Scott Agreement by, among other things, working for Beacon Hill in a "Competing Position" during the "Restricted Period" in the "Restricted Territory" and failing to advise Apex of her employment with Beacon Hill.

134.    Merriam continues to breach the Scott Agreement by working for Beacon Hill in a "Competing Position" during the "Restricted Period" in the "Restricted Territory."

135.    Apex has performed all of its obligations under the Merriam Agreement.

136.    As a consequence of Merriam's conduct, Apex has suffered and/or will continue to suffer irreparable harm or loss, and has suffered and will continue to suffer financial and economic loss.

137.    Merriam's breach of the Merriam Agreement has proximately caused financial harm to Apex in an amount to be proven at trial.  Such amount, however, is no less than $75,000, which represents the value of an injunction protecting Apex against unfair competition from Merriam and Apex's lost profits.

## COUNT III

### Tortious Interference with Contractual Relations against Beacon Hill

138.    Apex incorporates by reference Paragraphs 1-137 of this Verified Complaint.

139.    The Scott Agreement and the Merriam Agreement attached as **Exhibit 1** and **Exhibit 2** are valid and enforceable.

140.    Beacon Hill knew or reasonably should have known that Scott was bound by the Scott Agreement because Scott notified Beacon Hill of the agreement during Beacon Hill's recruitment process, and because Apex had notified Beacon Hill, through counsel, that its employees were subject to restrictive covenant agreements.

141.    Upon information and belief, Beacon Hill knew or reasonably should have known that Merriam was bound by the Merriam Agreement because Merriam notified Beacon Hill of the agreement during Beacon Hill's recruitment process, and because Apex had notified Beacon Hill, through counsel, that its employees were subject to restrictive covenant agreements.

142.    Because of its decades-long involvement in litigation arising out of similar agreements containing restrictive covenants, Beacon Hill knew that valid and enforceable agreements containing restrictive covenants existed between Apex, on one hand, and Scott and Merriam, on the other hand.

143.    Beacon Hill knew that Scott's acceptance of its offer of employment with Beacon Hill would constitute a breach of her restrictive covenant obligations to Apex.

144.    Beacon Hill knew that Merriam's acceptance of its offer of employment with Beacon Hill would constitute a breach of her restrictive covenant obligations to Apex.

145.    Beacon Hill knew that Scott's performance of her job duties with Beacon Hill would constitute a breach of her obligations to Apex under the Scott Agreement.

146.    Beacon Hill knew that Merriam's performance of her job duties with Beacon Hill would constitute a breach of her obligations to Apex under the Merriam Agreement.

147.    Upon information and belief, Beacon Hill instructed Scott and Merriam to disregard their restrictive covenant obligations to Apex and offered to pay for legal fees if a dispute developed regarding those obligations.

148.    Beacon Hill's conduct evidences improper motive and a use of improper means to interfere with Apex's contractual relations with Scott and Merriam.  This interference was, and is, without lawful justification or legitimate reason.

149.     As a direct and proximate result of Beacon Hill's tortious interference with the Scott Agreement and the Merriam Agreement, Apex has suffered damages in an amount to be proven at trial.  Such amount, however, is no less than $75,000, which represents the value of an injunction protecting Apex against unfair competition from Beacon Hill and Apex's lost profits.

## <u>REQUEST FOR INJUNCTIVE RELIEF</u>

150.     Apex incorporates by reference Paragraphs 1 through 150 of this Verified Complaint.

151.     By virtue of the allegations in this Verified Complaint, Apex has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Scott, Merriam, and Beacon Hill.

152.     Apex will suffer irreparable harm if Scott and Merriam are permitted to continue in Beacon Hill's employ in violation of their respective restrictive covenant obligations to Apex.

153.     The threatened injury to Apex, an organization whose value—and related ability to employ thousands of individuals—is tied in with preserving the sanctity of its confidential information and trade secrets, far outweighs the potential harm to Scott, Merriam, and Beacon Hill who can ply their respective trades in ways that do not violate or interfere with Apex's restrictive covenant agreements.

154.     Enforcing legal and valid contracts and preventing unfair competition is always in the public interest.  Scott and Merriam agreed to abide by their restrictive covenant obligations to Apex.  As such, the entry of injunction to enforce these legal and valid agreements would be consistent with—and not adverse to—the public interest.

155.    Unless Scott, Merriam, and Beacon Hill are preliminarily enjoined from engaging in any additional misconduct, Apex will be irreparably harmed in the marketplace by the loss of customers and customer goodwill and by damage to its reputation in the staffing marketplace.

156.    Such conduct would result in substantial loss which is unascertainable at this point in time, and future economic loss which is presently incalculable.

157.    Apex has no adequate remedy at law for Scott's, Merriam's, and Beacon Hill's misconduct.    Additionally, Scott and Merriam have contractually agreed in their respective agreements with Apex that Apex shall be entitled to injunctive relief to enforce the restrictions in the agreements, with such relief specifically including a temporary and/or permanent injunction, along with such other equitable relief as may be appropriate under the circumstances.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Apex Systems, LLC respectfully requests the following relief:

A.    Injunctive relief against Scott, whether acting alone or in concert with others, requiring her to comply with her obligations under the Scott Agreement;

B.    Injunctive relief against Merriam, whether acting alone or in concert with others, requiring her to comply with her obligations under the Merriam Agreement;

C.    Injunctive relief against Beacon Hill, whether acting alone or in concert with others, requiring Beacon Hill to cease interfering with Apex's contractual relations with its employees, including Scott and Merriam;

D.    An order requiring Scott, Merriam, and Beacon Hill, and anyone acting in concert with any of them, to preserve and not destroy or alter in any manner all documents or other information in their possession, custody or control (including, but not limited to, notes, calendar entries, invoices, e-mails, text messages, voice messages, and phone records) that may be relevant

or discoverable in this litigation, including, but not limited to, all records and any other evidence of Scott's and Merriam's communications on behalf of or as employees of Beacon Hill with any "Customer" as that term is defined in the Scott Agreement and the Merriam Agreement;

E.      An accounting of all income earned or derived from any business activity with any "Customer" as that term is defined in the Scott Agreement and the Merriam Agreement or from any business activity which violates the Scott Agreement or the Merriam Agreement;

F.      An order permitting Apex to take expedited discovery to determine the scope and nature of Scott's, Merriam's, and Beacon Hill's unlawful conduct as alleged in this Verified Complaint;

G.      Actual damages in excess of $75,000.00 Dollars, in an amount to be determined at trial;

H.      Punitive damages in an amount to be determined at trial;

I.      Attorneys' fees and costs;

F.      Interest; and

H.      Any other relief the Court deems appropriate.


This 11th day of March, 2021.

                                    Respectfully submitted,

                                    **APEX SYSTEMS, LLC**


                                    By: */s/ Rodney A. Satterwhite*_____
                                    Rodney A. Satterwhite (VSB #32907)
                                    Igor M. Babichenko (VSB #78255)
                                    McGuireWoods LLP
                                    Gateway Plaza
                                    800 East Canal Street
                                    Richmond, Virginia  23219

(804) 775-1000
(804) 775-1061 (Facsimile)
rsatterwhite@mcguirewoods.com
ibabichenko@mcguirewoods.com

## VERIFICATION OF COMPLAINT

Commonwealth of Virginia    )
                             )

City of Richmond             )

       The undersigned authorized representative of Apex Systems, LLC ("Plaintiff"), being duly sworn on his oath, does hereby state that he has read the foregoing Verified Complaint and that the statements set forth therein are true as he believes based on his personal knowledge and information supplied to him by Plaintiff's employees and agents and through records kept by Plaintiff in the ordinary course of business.

       This 10th day of March 2021.

By: _____

**FRITZ MOORE**
**Vice President, Principal**

Notary: _____

City / County of _Richmond_
Commonwealth/State of _Virginia_
The foregoing instrument was acknowledged before me this _10th_ day of _March_, _2021_, by _Fritz Moore_
_____
(name of person seeking acknowledgement)
_Gabriela Crawford_
Notary Public
My commission expires: _9 / 30 / 2023_

GABRIELA DEE CRAWFORD
NOTARY PUBLIC
REG # 7629164
MY COMMISSION EXPIRES
9/30/2023
COMMONWEALTH OF VIRGINIA